MARKEY, Chief Judge.
 

 Appeal from a judgment of the United States Claims Court, 3 Cl.Ct. 595 (1983), holding Dudley J. Godfrey, Jr. (Godfrey) liable for $159,361.26 of unpaid accrued taxes of Career Academies, Inc. (Career) pursuant to Internal Revenue Code section 6672, the 100 percent tax penalty provision.
 
 [1]
 
 We reverse in part and vacate in part.
 

 
 *1571
 

 Background
 

 This case arises from the bankruptcy of Career Academies, Inc., a Delaware corporation headquartered in Milwaukee, Wisconsin, and authorized to provide home-study and resident vocational training in such fields as radio broadcasting, medical and dental assisting, architectural and engineering drafting, hotel/motel training, and airline personnel and travel.
 

 Career’s shares were listed on the American Stock Exchange until August 14, 1972, after which they were traded in the over-the-counter market. On May 18, 1974, Career had 6,992 stockholders and 4,646,099 shares outstanding.
 

 Dudley Godfrey was and is a partner in Godfrey and Kahn, S.C., a business law firm in Milwaukee with special tax expertise.
 
 [2]
 
 Godfrey was elected to Career’s Board of Directors on August 18,1970, and became Chairman on June 30, 1972. He was also made Chairman of the executive committee, which held no meetings after May 1973. In his testimony before the Claims Court, Godfrey said he accepted the Chairmanship to provide consultation and advice concerning Career’s financial and personnel problems. He received no salary as Chairman and was not officed at any Career facility.
 

 As Chairman of the Board, Godfrey never signed, and was never authorized to sign, the checks of Career or its subsidiaries. The Claims Court found that God-frey never “signed any IRS 941 Forms submitted by the corporation or other payroll or tax returns of Career and [never] participated in any way in the preparation of such returns or in the preparation of any payrolls for Career.” 3 Cl.Ct. at 598.
 

 As a Director, Godfrey exercised the authority given him by the bylaws. He participated in electing officers, hired or approved the hiring of top level consultants, delegated authority to establish bank accounts, and designated signatories for those accounts. He also authorized borrowing by officers on behalf of the corporation, authorized major sales programs, ratified and approved settlements made by officers, and approved loan agreements made with various banks. Godfrey was also instrumental in negotiating a critical (but ultimately unsuccessful) recapitalization agreement with a potential investor. Finally, Godfrey authorized the filing of Career’s Chapter XI bankruptcy petition.
 

 Career had sustained substantial operating losses in each of the years 1967-1972. In November 1972, it defaulted on semiannual interest payments on a total of $12,-000,000 of 5% and 6-percent convertible subordinated notes. Responding to this desperate situation, Godfrey and other members of Career’s management entered financing negotiations with lenders, potential lenders, prospective buyers, and potential investors. Those efforts led to negotiation of a loan and recapitalization agreement with American Management Services, Inc. (AMS). Brian Gordon (Gordon), a financier/investor in the Washington, D.C., area, was the principal of AMS.
 

 On August 30, 1973, Career executed a letter of intent with AMS, the Chemical Bank, and the United States Trust Company of New York. As part of the package, Gordon insisted on his choice of management to run the “new” Career. Godfrey agreed, and got the Career Board to select Gordon’s candidates, Joseph P. Maher (Maher) as president and Joseph L. Ferrare (Ferrare) as executive vice-president on September 10, 1973.
 

 Throughout the entire period in which the AMS package was being negotiated, and after Maher and Ferrare had been installed, Career had serious financial diffi
 
 *1572
 
 culties. Its banks threatened foreclosure, student enrollments declined, and bills were paid late. On March 1, 1974, Maher resigned as president and was replaced by Ferrare.
 

 As president, Ferrare was in daily contact with Terrence J. Metzdorff (Metz-dorff), Career’s vice president/treasurer, concerning issuance of checks to creditors, including the Internal Revenue Service (IRS). Ferrare and Metzdorff ran the day-to-day operations of Career. Both were authorized to sign checks, including those in payment of withheld taxes, and to prepare Career’s Form 941 (withholding tax returns). Unlike Ferrare, who was an inside director, Metzdorff was never elected to the Board, but did regularly attend its meetings as an advisor. Neither Ferrare nor Metzdorff owned stock, directly or beneficially.
 

 In October 1978, in a meeting attended by Godfrey, Ferrare and Andrew Lauritzen (Lauritzen) (an attorney with Godfrey & Kahn and Career’s outside legal counsel), Metzdorff expressed concern about unpaid withholding taxes (income and FICA) and threatened to resign unless relieved of responsibility for paying them. Ferrare gave Metzdorff an October 5, 1973 letter relieving him of that responsibility. Metzdorff testified that Godfrey met his concern with “no one ever goes to jail for not paying taxes, so I wouldn’t be too concerned about that.” 3 Cl.Ct. at 601.
 

 Federal tax problems continued. Monthly reports prepared in Metzdorff’s office showed that in October 1973 withholding taxes were accruing and were being paid late. The December 1973 report showed $9,095 (FICA) and $30,689 (income tax withholding) accrued and unpaid. Metz-dorff distributed the reports to all corporate officers and the Board.
 

 In the spring of 1974, Arthur Anderson & Company was asked to audit Career’s books for the two fiscal years ending January 31, 1974, in connection with the proposed AMS recapitalization. In a general representation letter connected with the audit, Godfrey, Ferrare, and Metzdorff stated: “[t]he Company is presently past due in the remittance of Federal and State withholding taxes in the amount of approximately $250,000 as of May 31, 1974.” 3 Cl.Ct. at 601. Though Godfrey stated at trial that when he signed that letter he knew of that delinquency, he also said he directed outside counsel Lauritzen to insure that the taxes were paid. The trial court concluded that, “aside from his comments to Mr. Lauritzen, Mr. Godfrey appears to have taken no subsequent affirmative action to investigate further and rectify the situation.” 3 Cl.Ct. at 601.
 

 On July 11, 1974, Arthur Anderson & Company sent Career’s consolidated financial statements for 1973 and 1974 and their audit to Metzdorff, who distributed them to Career’s executive officers and the Board. The financial statements included:
 

 The Company is also in default of its notes payable to bank, certain other notes payable and the notes payable under a credit agreement
 
 and is unable to pay all current obligations, including social security taxes and income taxes withheld from employees.
 
 At January 31, 1974, such tax deficiency approximated $80,000. The Company has not made any payment subsequent to year end and at June 1, 1974,
 
 the deficiency approximates $250,000; certain monetary penalties can be levied.
 
 [Emphasis added.]
 

 3 Cl.Ct. at 601.
 

 IRS’s Milwaukee office well knew of the deficiency and, in September, 1974, threatened to close the corporation down unless it paid withholding taxes for the first and second quarters of 1974. In the same month, Metzdorff contacted Ferrare, who called on the AMS revolving credit line for the required $250,000 and Metzdorff paid IRS the first and second quarter 1974 withholding taxes in full.
 

 Career was walking a financial tightrope. Metzdorff paid only those bills authorized for payment by Ferrare. The Claims Court found that “[i]t was the practice during this time for Mr. Metzdorff and Mr. Fer-rare to get together approximately once each week to decide which creditors would be paid and which bills would be deferred.
 
 *1573
 
 Only those bills that absolutely had to be paid to keep the operation going (payroll, rent, utilities, etc.) would be paid. Mr. Ferrare ran this part of the operation with an iron hand and completely dominated Mr. Metzdorff in this regard.” 3 Cl.Ct. at 601-02.
 

 The Board met every two months. Fer-rare would normally go over the financial picture and Metzdorff would fill in details when asked. In the September 1974 meeting, Ferrare presented an upbeat financial picture, indicating that the corporation would shortly turn the corner on profitability because of increased student enrollment contemplated with the start of the school year and the pending AMS recapitalization.
 

 Ferrare’s optimism proved to be unfounded. On or about November 12, 1974, Metzdorff resigned, precipitating a meeting of the Board on November 19, 1974, at which it directed a thorough review of the beleaguered corporation’s assets. In late November, AMS withdrew from the proposed recapitalization. Godfrey sought other loans or sale of Career’s subsidiary schools, without success.
 

 On December 5, 1974, Godfrey wrote the IRS, seeking to forestall collection efforts on the delinquent third and fourth quarter withholding taxes. He said it would be advisable for all creditors (including the United States) to keep Career alive, and requested deferral of IRS enforcement action until December 11, 1974.
 

 At Career’s December 9 Board meeting, the directors concluded that insolvency proceedings were necessary if Career were to stay in business and increase the value of its assets.
 

 Career filed for an arrangement under Chapter XI of the Bankruptcy Act on December 12, 1974. It was adjudicated bankrupt on April 15, 1975. The IRS filed a claim in the bankruptcy proceeding for employment taxes aggregating $210,925.65. After all assets were sold and the proceeds distributed, the IRS received nothing.
 

 The Claims Court
 

 The IRS assessed a 100 percent penalty on Godfrey and two other directors (Gerald J. Kahn and Gilbert Palay) for $191,734.68 in unpaid taxes.
 
 [3]
 
 On June 23, 1977, each paid $150.00 to the IRS (the amount in excess of income and FICA taxes withheld from one employee) and filed a claim with IRS for refund of the $150.00 and abatement of the assessment balance. The claims being denied, each director filed suit in the Claims Court for refund of the amounts paid and the IRS counterclaimed for the assessment balance.
 

 The Claims Court held Godfrey liable for the full amount of the tax deficiency. The government does not on appeal contest the Claims Court’s holding that Kahn and Pa-lay were not liable because they were not “persons” within the meaning of the statute.
 

 The Claims Court also found that the IRS failed to allocate certain undesignated taxes paid during the six month period before bankruptcy, resulting in a reduction of $32,213.42 in the judgment against God-frey. The government cross-appealed that part of the judgment.
 

 The Statute
 

 Section 6672 of title 26 states:
 

 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. 26 U.S.C. § 6672 (1976).
 

 For the purposes of § 6672, “person” is defined in 26 U.S.C. § 6671:
 

 (b) Person defined — The term “person”, as used in this subchapter, includes an
 
 *1574
 
 officer or employee of a corporation * * who as such officer, employee * * * is under a duty to perform the act in respect of which the violation occurs.
 

 Thus a person is subject to a 100 percent penalty if he satisfies two separate statutory requirements. First, he must be under a duty to “perform the act in respect of which the violation occurs,” (§ 6671(b)) and that duty is “to collect, truthfully account for, and pay over” any taxes (§ 6672). Such a person is a “responsible person”.
 
 [4]
 
 Second, the “responsible person” must have “willfully” failed to collect, truthfully account for, and pay over, or have “willfully” evaded or defeated the tax or tax payment. As the Claims Court correctly noted, both statutory requirements must be present for the 100 percent penalty to be imposed.
 
 McCarty v. United States,
 
 437 F.2d 961, 967, 194 Ct.Cl. 42 (1971).
 

 Issues Presented
 

 (A) Did the Claims Court err in determining that Godfrey was a “responsible person” under 26 U.S.C. 6671(b)?
 

 (B) Did the Claims Court err in determining that Godfrey’s conduct was “willful” under 26 U.S.C. 6672?
 

 (C) Did the Claims Court err in reducing the judgment by $32,213.42?
 

 Analysis
 

 The Claims Court held, 3 Cl.Ct. 605-06, that Godfrey satisfied the “responsible person” requirement of § 6672:
 

 The importance of the role of plaintiff Dudley J. Godfrey, Jr., in the operation and management of Career Academy, Inc., can hardly be underestimated. Since being elected a director in 1970, and certainly by the time he was elected chairman of the board in June 1972, he had become the single most important individual directing the business affairs of the corporation. He was the one individual at the corporation who provided continuity at the highest levels of authority during the last tumultuous five years of Career’s existence. He was the one individual at the corporation to whom everyone looked for the ultimate financial, personnel and other management decisions. The banks looked to him, the corporate officers and employees looked to him, and the directors of the corporation looked to him for the ultimate operation and management decisions. He was the one who took the lead in staving off the banks from foreclosing on defaulted loans. He was the one who took the lead in negotiating the new loans and recapitalization efforts. He was the one who took the lead in negotiating sales of subsidiary schools. He was the one who had the ultimate say on who was hired or fired. He was also the one (along with Mr. Ferrare and Mr. Metzdorff) who knew as early as October 1973 that the corporation was running behind on the payment of its tax obligations to the IRS. In short, the Court finds him to be one of the responsible officials with ultimate authority to order the payment of the delinquent corporate withholding taxes.
 

 The purpose of the 100 percent penalty provision “is to permit the taxing authority to reach those [persons] responsible for the corporation’s failure to pay the taxes which are owing.”
 
 White v. United States,
 
 372 F.2d 513, 516, 178 Ct.Cl. 765 (1967). Though the legislative history is uninformative, “it is evident from the face of the section that [§ 6672] was designed to cut through the organizational form and impose liability upon those actually responsible for an employer’s failure to withhold and pay over the tax.”
 
 See Pacific National Insurance Co. v. United States,
 
 422 F.2d 26, 31 and n. 12 (9th Cir.),
 
 cert. denied,
 
 398 U.S. 937, 90 S.Ct. 1838, 26
 
 *1575
 
 L.Ed.2d 269 (1970). Accordingly, “the section is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one person.”
 
 White v. United States,
 
 372 F.2d at 516.
 
 See also Feist v. United States,
 
 607 F.2d 954, 960, 221 Ct.Cl. 531 (1979);
 
 Bold-ing v. United States,
 
 565 F.2d 663, 671, 215 Ct.Cl. 148 (1977);
 
 Burack v. United States,
 
 461 F.2d 1282, 1291, 198 Ct.Cl. 855 (1972);
 
 accord McCarty v. United States,
 
 437 F.2d at 967;
 
 Scott v. United States,
 
 354 F.2d 292, 296, 173 Ct.Cl. 650 (1965).
 

 The overwhelming weight of case precedent requires the factfinder to look through the “mechanical functions of the various corporate officers”,
 
 White v. United States,
 
 372 F.2d at 516, to determine the persons having “the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.”
 
 Haffa v. United States,
 
 516 F.2d 931, 936 (7th Cir.1975). The inquiry required by the statute is “a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation’s failure to pay oyer its taxes.”
 
 White v. United States,
 
 372 F.2d at 517.
 
 See also Barrett v. United States,
 
 580 F.2d 449, 452, 217 Ct.Cl. 617 (1979);
 
 Bauer v. United States,
 
 543 F.2d 142, 148, 211 Ct.Cl. 276 (1976). Whether the plaintiff is a “person” with ultimate authority “hinges upon the application of the relevant facts to the ... pertinent provisions of the Internal Revenue Code of 1954.”
 
 Bauer v. United States,
 
 543 F.2d at 144. As the Ninth Circuit commented in
 
 Pacific National Insurance Company v. United States,
 
 422 F.2d at 30-31:
 

 [T]he definition of “persons” [in IRC § 6671] does not require that they be formally vested with the office or employed in the position normally charged with this function; the definition simply “includes” such persons. Indeed, the language itself does not require that they be officers or employees of the corporation at all,
 
 so long as they are in fact responsible for controlling corporate
 
 disbursements____ [I]t reaches those who have “the final word as to what bills should or should not be paid, and when.” [Emphasis added.]
 

 The mechanical duties of signing checks and preparing tax returns are thus not determinative of liability under § 6672. In
 
 White v. United States,
 
 372 F.2d at 514-15, the president of the corporation was held liable because he directly controlled the secretary-treasurer in the latter’s collecting, accounting for, and paying over the taxes. He was the president and 50 percent shareholder of a closely-held corporation. He actively conducted the day-to-day operations of the business: he came to the office daily, hired and laid off employees, ordered materials and supplies, conducted business correspondence, set the price of jobs, negotiated all contracts with customers, prepared invoices, disbursed corporate checks signed by him and the secretary-treasurer in payment of supplier’s bills and other business expenses, and deposited the business receipts in the corporation’s bank account. His address was used for receiving most business mail; his signature was required on all corporate checks. He also drew a weekly salary from the corporation. Under these circumstances, the taxpayer was held to clearly fall within the category of responsible person because “he had the authority to act, and did act, as fiscal manager of that company's affairs, and exercised authority over the general policy, affairs, and finances of the corporation.” 372 F.2d at 517. Nothing remotely comparable to such control was here exercised by Godfrey.
 

 The Claims Court effectively held that Godfrey’s
 
 status
 
 as chairman cum ad-visor-negotiator — and the respect and deference accorded that status — amounted to “ultimate authority” or “power to control” for purposes of § 6672. The case law will not support that holding.
 

 It is material, but not controlling, if God-frey were the “single most important indi
 
 *1576
 
 vidual” in the business affairs of the corporation, who “provided continuity” during Career’s last years, and to whom “everyone looked for the ultimate financial, personnel and other management decisions,” of the corporation. 3 Cl.Ct. at 605-06. Those broad characterizations do not address the crucial inquiry required by the statute — i.e. whether Godfrey was or could be held to be a person “under a duty to perform the act in respect of which the violation occurs.” 26 U.S.C. § 6671(b).
 

 As the case law makes abundantly clear, a person’s “duty” under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the cheeks of the corporation,
 
 see White v. United States,
 
 372 F.2d at 515,
 
 McCarty v. United States,
 
 437 F.2d at 968,
 
 but cf. Barrett v. United States,
 
 580 F.2d at 953-54,
 
 Marlowe v. United States,
 
 2 Cl.Ct. 711, 716 (1983), or to prevent their issuance by denying a necessary signature,
 
 see Burack v. United States,
 
 461 F.2d at 1291,
 
 Bolding v. United States,
 
 565 F.2d at 671, or where that person controls the disbursement of the payroll,
 
 see White v. United States,
 
 372 F.2d at 515, or controls the voting stock of the corporation,
 
 see White v. United States,
 
 372 F.2d at 514,
 
 McCarty v. United States,
 
 437 F.2d at 967-68,
 
 Burack v. United States,
 
 461 F.2d at 1286,
 
 Feist v. United States,
 
 607 F.2d at 960,
 
 cf. Marlowe v. United States,
 
 2 Cl.Ct. at 716, he will generally be held “responsible”.
 

 In no case has an outside director of a publicly held corporation, who neither signed nor had authority to sign checks, who did not participate in the day-to-day fiscal management of the corporation, who did not control the payroll, who did not determine which creditors would be paid and which would not, and who did not own a significant fraction of the corporation’s voting securities, been held a “responsible” person under § 6672.
 

 That Godfrey took the lead in attempting to avoid Career’s insolvency, negotiated emergency loans and recapitalization plans, helped to arrange for sale of corporate assets, and participated in the hiring and firing of top corporate management are factors insufficient alone to make Godfrey a “responsible person” under § 6672. “The courts recognize the normal division of and limitations on authority exercised by various representatives of a particular business.”
 
 Bauer v. United States,
 
 543 F.2d at 149. Those normal activities within the proper sphere of Godfrey’s role as chairman of the board do not in themselves give rise to a “duty” under the statute, i.e. to “collect, account for, and pay over” taxes. Absent here is any evidence that Godfrey had or exercised control of the collection, accounting for, and payment over of taxes.
 

 To hold Godfrey a “responsible person” on the present record would be to hold as a “responsible person” every board chairman who took an active interest in the solvency of the corporation he serves. Godfrey’s activities were not those of a passive “above the fray” chairman, but they do not, without more, impose or create the “duty” expressly described in the statute.
 

 The Claims Court also found Godfrey a “responsible person” because of his knowledge “as early as October 1973 that [Career] was running behind on the payment of its tax obligations to the IRS.” 3 Cl.Ct. at 604. Godfrey’s knowledge of nonpayment may be relevant to the issue of willfulness,
 
 Marlowe v. United States,
 
 2 Cl.Ct. at 716, but it is irrelevant in considering the question of whether he was a “responsible person” under 26 U.S.C. § 6671(b).
 

 The Claims Court erred in determining that Godfrey was a “responsible person”.
 

 Willfulness
 

 Assuming,
 
 arguendo,
 
 that Godfrey were a “responsible person” under § 6672, the record supplies no basis for a determination that he “willfully” failed to collect, account for, pay over, or “willfully” evaded or defeated taxes.
 

 Whether “the failure to pay the overdue taxes [is] willful has been seen ...
 
 *1577
 
 as calling for proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing — and not as requiring a special intent to defraud or deprive the Government of monies withheld on its account.”
 
 Scott v. United States,
 
 354 F.2d at 295. The Court of Claims has consistently rejected the view that “a finding of willfulness entails a showing of evil motive, bad purpose, or calculated malevolence.”
 
 Id.
 
 The focus of inquiry is rather “on the deliberate nature of the individual’s election not to pay over the money and the circumstances of that refusal.”
 
 Id.
 

 The Court of Claims in
 
 White
 
 defined willfulness as meaning “a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government.” 372 F.2d at 521. Willful conduct may also include a reckless disregard of an “obvious and known risk” that taxes might not be remitted.
 
 Feist v. United States,
 
 607 F.2d at 961. “Mere negligence in failing to ascertain facts regarding a tax delinquency,” however, “is insufficient to constitute willfulness under the code.”
 
 Bauer v. United States,
 
 543 F.2d at 150;
 
 see also Bolding v. United States,
 
 565 F.2d at 672.
 

 Willfulness must also be viewed in light of the “personal fault” of the plaintiff: “[t]he fact that the provision imposes a ‘penalty’ and is violated only by a ‘willful failure’ is itself strong evidence that it was not intended to impose liability without personal fault.”
 
 Slodov v. United States,
 
 436 U.S. at 254, 98 S.Ct. at 1788. Personal fault being a necessary element of willfulness, relevant evidence bearing on the element of personal fault may not be ignored.
 
 Feist v. United States,
 
 607 F.2d at 962.
 

 The Claims Court noted that Godfrey knew Career was behind in payment of withholding taxes as early as October 1973. 3 Cl.Ct. at 601. After a review of events of the first two quarters of 1974, it concluded that “[t]he evidence is simply overwhelming that Mr. Godfrey knew for many months about Career’s withholding delinquencies and did not do anything to rectify the problem.” 3 Cl.Ct. at 606. That statement is in this case directed to non-probative considerations in respect of the willfulness determination required by § 6672.
 

 Following the IRS’s demand and threat to close down the corporation, the delinquent withholding taxes for the first two quarters of 1974
 
 were paid in full.
 
 3 Cl.Ct. at 601. As the Claims Court noted, Godfrey had instructed Lauritzen as early as May 1974 “to check into the [withholding tax] delinquencies and to insure that the taxes were paid.”
 
 Id.
 
 Thus the sole act of Godfrey in relation to taxes was an instruction looking to payment and not to evasion or defeat.
 

 There is no evidence, and the Claims Court made no finding, that after Career’s September 1974 payment of the $250,000 delinquency Godfrey actually knew of any continuing tax delinquency for the third or fourth quarter, or that Godfrey knew current withholding taxes were not actually being paid in a timely fashion.
 

 The Government argues that whether Godfrey had actual knowledge during the Oetober-December period is irrelevant to liability under the statute. The Government conceded at oral argument that, at the time it wishes to charge Godfrey with actual knowledge of continuing delinquencies (the November 19, 1974 emergency board meeting), there were little or no unencumbered funds to pay the taxes, even if Godfrey had so demanded. Ferrare testified that, if Godfrey had at that time asked him to withhold or pay the taxes, “that would have triggered off another question, saying fine, we’re going to pay the taxes then tell me where I get the money from.” The government’s position would make failure to order the impossible the equivalent of willfulness.
 

 Under the view urged to this court, God-frey’s knowledge of past delinquencies would alone have created a duty to affirmatively inquire into and cure any new deficiency which might arise, and his failure to carry out that duty would establish willfulness. That argument was apparently accepted by the Claims Court:
 

 Godfrey knew for many months about Career’s withholding delinquencies and
 
 *1578
 
 did not do anything to rectify the problem. There clearly was money coming in from student enrollments and Government grants during this period of time, and it is equally clear that payroll, rents, utilities and other essential creditors were being paid, and thus preferred over the Federal Government. Mr. Godfrey was aware of all this and thus must be held to have voluntarily, consciously and intentionally failed to collect and pay over the taxes by condoning such activity. [Citations omitted] Mr. Godfrey’s influence in the corporation during the last critical year was such that had he ordered the taxes to be paid, they would have been paid.
 

 3 Cl.Ct. at 606.
 

 The willfulness requirement is satisfied “if the responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government, ... such as by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted,”
 
 Mazo v. United States,
 
 591 F.2d 1151 (5th Cir.),
 
 cert. denied,
 
 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979);
 
 cf. Bolding v. United States,
 
 565 F.2d at 672. The case law requires, however, at least actual notice of the current delinquency to establish an affirmative duty to act.
 

 An important factor in the willfulness determination here is the period to which the assessment relates. The Government did not assess the 100 percent penalty for non-payment of withheld taxes during the first two quarters of 1974, of which God-frey admits actual knowledge. It assessed the penalty for taxes left unpaid after Career’s September 1974 payment, and there has been no showing that Godfrey had actual knowledge of that non-payment until the eve of bankruptcy.
 

 To hold that Godfrey’s knowledge of a past delinquency alone makes him a guarantor of future tax payments would be contrary to the logic of the Supreme Court’s discussion of willfulness in
 
 Slodov v. United States,
 
 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251.
 

 In
 
 Slodov,
 
 the government argued that a “responsible person” renders himself personally liable to the § 6672 penalty by using gross receipts to purchase inventory or pay wages, or even by using personal funds for those purposes, so long as any withholding taxes remain unpaid to the United States. 436 U.S. at 252, 98 S.Ct. at 1787. The Court said:
 

 As soon as the corporation embarks on [continued business orperations], however, the “responsible person” is potentially liable to heavy civil and criminal penalties not for doing anything which compromised the Government’s collection efforts, but for doing what the Government regards as maximizing its chances for recovery. As construed by the Government, § 6672 would merely discourage changes of ownership and management of financially troubled corporations and the infusion of equity or debt funding which might accompany it____
 

 [It] would, in effect, make the responsible person assuming control of a business a guarantor for payment, of the delinquent taxes simply by undertaking to continue operation of the business. That construction is precluded by the history and context of § 6672 cognate provisions of the Code.
 

 436 U.S. at 253-54, 98 S.Ct. at 1788.
 

 Contrary to the representations of the government, § 6672 cannot be read as imposing here an absolute duty to “pay over” the amounts which should have been collected and withheld. See
 
 Slodov v. United States,
 
 436 U.S. at 255, 98 S.Ct. at 1789. Nor may the provision be read as imposing in this case a risk of liability which would not further the overall deterrent and tax collection goals of the statute.
 
 Id.
 
 at 253 and n. 16, 98 S.Ct. at 1788 and n. 16. Moreover, as was noted in
 
 Slodov,
 
 “that the provision imposes a penalty and is violated only by a ‘willful’ failure is itself strong evidence that the statute was not intended to impose liability without personal fault.”
 
 Id.
 
 at 255, 98 S.Ct. at 1789.
 

 As applied to Godfrey, it is clear that his conduct as Career’s chairman, assuming,
 
 *1579
 

 arguendo,
 
 that he could be called a “responsible person”, lacks the requisite willfulness for liability under the statute. The failure to pay over the taxes here involved lacks, on this record, the element of personal fault attributable to Godfrey that is the epitome of willfulness. The government strenuously urges this court to hold that (1) Godfrey’s awareness of past (but eliminated) tax deficiencies created an affirmative duty to investigate and absolutely prevent all future deficiencies; (2) Godfrey’s failure to know of the subsequent tax deficiency here involved constituted a breach of that duty, and (3) that breach of that duty establishes, ipso facto, Godfrey’s personal fault under the statute. In light of the statutes and in light of
 
 Slodov v. United States, supra,
 
 we cannot so hold.
 

 Because Godfrey was not a “responsible person” as defined by § 6671(b) and did not fail willfully to execute a duty imposed by § 6672, that part of the judgment holding him liable for the unpaid taxes at issue must be reversed. In light of that reversal, that part of the judgment relating to the IRS’s allocation of certain tax payments must be vacated as moot and the government’s cross-appeal must be dismissed.
 

 REVERSED IN PART, VACATED IN PART.
 

 [1]
 

 . Godfrey’s actual tax liability was determined by subtracting from the sum of $191,734.68 (unpaid income and Federal Insurance Contribution Act (FICA) taxes of Career Academies from July 1, 1974, through December 11, 1974), $32,-213.42 (federal college work-study funds misap
 
 *1571
 
 plied to Godfrey’s tax liability), less a $150.00 pre-payment establishing Claims Court jurisdiction.
 

 [2]
 

 . Godfrey's partner, Gerald J. Kahn, had been a director and secretary of Career since 1961. Neither Godfrey nor Kahn received a salary for their services on the Board. Godfrey & Kahn billed Career $57,000 for legal tasks undertaken in 1974. As of December 31, 1974, the balance due the firm for 1974 and previous years was $152,116.23. In 1974, Kahn owned 62,439 shares (1.34 percent) and Godfrey owned 59,716 shares (1.29 percent) in Career. 3 Cl.Ct. at 597, 598.
 

 [3]
 

 . Assessment is made by recording the taxpayer’s liability with the Secretary of the Treasury, 26 U.S.C. § 6203. Notice and demand for payment are generally made within 60 days of the assessment, 26 U.S.C. § 6303(a).
 
 See Slodov v. United States,
 
 436 U.S. 238, 244 n.5, 98 S.Ct. 1778, 1784 n. 5, 56 L.Ed.2d 251 (1978).
 

 [4]
 

 . The term "responsible person” is an invention of the courts, having no statutory definition or discussion in the legislative history. As the Supreme Court recently noted in
 
 Slodov v. United States,
 
 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251:
 

 "The cases which have been decided under § 6672 generally refer to the 'person required to collect, truthfully account for, and pay over any tax imposed by this title’ by the shorthand phrase ‘responsible person.’ We use that phrase without necessarily adopting any of the constructions placed upon it in the decisions.”
 

 436 U.S. at 246 n. 7, 98 S.Ct. at 1784 n. 7.