J. Allen DOUGHERTY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 380–85T.

United States Claims Court.

Oct. 11, 1989.

J. Allen Dougherty, Philadelphia, Pa., pro se; Laurence Schor, Washington, D.C., of counsel.

Mary B. Seyferth, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

FUTEY, Judge.

J. Allen Dougherty brings this action to recover $100.00, plus interest, paid in partial satisfaction of a 100 percent penalty assessed against him pursuant to section 6672 of the Internal Revenue Code (I.R.C.), 26 U.S.C. § 6672(a) (1954),[1] for unpaid Federal employment taxes of the Virginia Energy and Land Company for the third and fourth tax quarters of 1980 and the first and second tax quarters of 1981. The United States has counterclaimed for $76,-811.20.

### Factual Background

Bar–Sel Equipment, Inc. (Bar–Sel) was incorporated under the laws of Virginia on March 25, 1977, for the purpose of mining coal.[2] On June 7, 1978, Bar–Sel entered into a lease agreement for four tracts of land (approximately 419 acres) located in Lee County, Virginia, and Harlan County, Kentucky. Bar–Sel, operated by Charlie Poe and his wife Barbara Poe, began to develop the leased property for coal mining operations. In early 1979, Bar–Sel ran out of money and development of the property ceased.

In order to continue operations on the property, Charlie Poe sought to raise additional capital. In the summer of 1979, he talked to Les Denson and Gary Frink who were interested in investing in a coal mine. Gary Frink thereafter approached plaintiff J. Allen Dougherty—an attorney whom Gary Frink had previous dealings with—to aid in structuring a limited partnership to acquire, develop and mine coal on the property leased by Bar–Sel. Gary Frink later asked plaintiff to acquire an ownership interest in the venture.

On September 11, 1979, Big Man Coal Partnership (Big Man) was formed pursuant to a limited partnership agreement.[3] By agreement between Charlie Poe, Barbara Poe, Bar–Sel Equipment, Inc., and Big Man, all of Bar–Sel's outstanding stock was contributed to Big Man. Big Man entered into a sublease and operating agreement with Bar–Sel which entitled Big Man to mine coal on the property leased by Bar–Sel and the use of mining equipment owned or controlled by Charlie Poe.

In the fall of 1979, an application was made on behalf of Big Man with the Farmer's Home Administration, an agency of the Department of Agriculture, for a coal development loan guarantee in the amount of $950,000.00. On December 5, 1979, the Farmers and Miners Bank of Lee County, Virginia, loaned Big Man $800,000.00. This sum was guaranteed by the Farmer's Home Administration. Charlie Poe, plaintiff, Gary Frink, and Les Denson each provided a $200,000.00 personal guarantee on the loan and a $15,000.00 certificate of deposit to Farmers and Miners Bank as additional security. Charlie Poe and Barbara Poe gave a deed of trust on their house in Dryden, Virginia, as security for the payment of these loans.

The Big Man Coal Company (as distinct from the Big Man Coal Partnership) was

---

1. Any references herein to section 6672 are to the Internal Revenue Code, 26 U.S.C. § 6672(a) (1954), unless otherwise noted.

2. Barbara Poe and Selma Poe were Bar–Sel's directors and sole shareholders from the time of Bar–Sel's incorporation in 1977 until its stock

was contributed to Big Man Coal Partnership in 1979.

3. The Big Man Partnership agreement was later amended on December 5, 1979, February 2, 1980 and April 1, 1981.

incorporated under the laws of the Commonwealth of Virginia on August 15, 1979. It subsequently changed its name to Virginia Energy and Land Company (VELCO) on September 5, 1979. VELCO acted as the operating company for Big Man and mined coal owned by Big Man. VELCO mined this coal through the coal lease owned by Bar–Sel, and incurred payroll and operating expenses in connection with these mining activities. The money received from the sale of this coal was deposited in Big Man bank accounts and then transferred to VELCO to pay mining expenses and related expenses, such as the coal royalties and permit fees owed to Bar–Sel. VELCO had no source of income other than that obtained from Big Man mining activities. Big Man owned essentially all of the coal mining equipment and railroad carloading facilities used by VELCO employees for mining coal. Bar–Sel's only assets were the leases to the property and related mining permits and bonds. Although they were separate entities, VELCO, Big Man, and Bar–Sel functioned as one integrated enterprise.

In the fall of 1979, Barbara Poe was hired as bookkeeper and office manager for the enterprise, at which position she worked from December 1979 to May of 1981. Charlie Poe was hired in December 1979 as general manager of the mining operation. In early 1980 his duties changed when Gary Frink moved to Pennington Gap (the site of the physical operation) and Bill Huff was hired as VELCO's general mining superintendent. Plaintiff participated in these employment decisions.

Big Man's general partners were VELCO and Gary Frink, and its initial limited partners were plaintiff, Gary Frink, Les Denson, and Charlie Poe.[4] In November of 1979 Barbara and Selma Poe resigned as officers of Bar–Sel to be succeeded on December 14, 1979, by Gary Frink as president, Les Denson as vice president and plaintiff as secretary. VELCO had the same officers as Bar–Sel. Plaintiff was a thirty-percent shareholder of VELCO, while both Gary Frink and Les Denson owned thirty-five percent of the outstanding stock. Plaintiff was also a director of VELCO and Bar–Sel.

The parties dispute plaintiff's status and role as VELCO's treasurer. Defendant points to affidavits filed in the United States District Court for the District of South Carolina in November 1980 and January 1981 in connection with a commercial litigation dispute involving VELCO and Big Man in which plaintiff repeatedly identified himself as the secretary-treasurer of VELCO. In addition, the Articles of Incorporation of the Big Man Coal Company (the predecessor of VELCO) provides for a president, vice president and secretary-treasurer. Plaintiff admits that he was originally named as secretary-treasurer of VELCO, but contends that he never served in that capacity.[5]

Mining operations commenced on December 5, 1979, after Big Man received the $800,000.00 loan from the Farmers and Miners Bank. The funds from this loan were expended almost immediately. Approximately $40,000.00 of the money was used to satisfy Bar–Sel's unpaid and delinquent Federal employment tax liabilities. Gary Frink, Les Denson and plaintiff were aware of these tax liabilities when Big Man acquired Bar–Sel.

The Big Man, Bar–Sel, VELCO coal mining enterprise had financial difficulties

---

**4.** In December of 1980, Mr. and Mrs. William Clark were admitted into Big Man as limited partners.

**5.** The duties of the secretary-treasurer, as set forth in the By–Laws of VELCO included: "He shall have custody of the funds and securities of the corporation and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the board of directors." By–Laws of VELCO, paragraph 13(b), Joint Exhibit (Jt.Exh.) 20b. As discussed *infra* at pp. 8–9, it is the acts performed, not the formal labels attached, which the court must look to in determining whether a party is responsible for the payment of taxes under section 6672. Although the issue of whether plaintiff was secretary or secretary-treasurer has bearing on the issues before the court, it is the review of plaintiff's actual authority which is the primary focus here.

from its inception and active mining operations were eventually suspended in March 1981, although the enterprise continued to employ workers through April 1981. After April 1981, Barbara Poe directed the Postal Service to forward all mail addressed to VELCO, Big Man and Bar–Sel's Pennington Gap office to plaintiff in Philadelphia, Pennsylvania. After its demise, VELCO had $76,911.20 in unpaid Federal employment taxes.

On June 26, 1981, at plaintiff's direction, voluntary bankruptcy petitions were filed under Chapter 11 on behalf of all three entities. The bankruptcy was later converted to Chapter 7 proceedings when the respective creditors of the enterprise were unable to effect a plan of reorganization. These proceedings were closed on August 13, 1984.

Plaintiff is a partner in the law firm of Schnader, Harrison, Segal & Lewis in Philadelphia, Pennsylvania, where he has practiced on a full-time basis starting in May of 1969. Since 1960, he has specialized in the area of Federal tax law, and has represented clients in actions under section 6672 concerning unpaid Federal employment taxes. At all times relevant to this litigation plaintiff's primary residence and principal law office were located in Pennsylvania.

Prior to December 5, 1979, plaintiff advised Gary Frink and Les Denson about the structure of Big Man, the acquisition of Bar–Sel and its coal leases, the acquisition of mining equipment from Charlie Poe, the acquisition of entities owned or controlled by Charlie Poe, and the loan agreement with the Farmers and Miners Bank. Plaintiff's law firm billed Bar–Sel $10,731.4[_] [6] for these services, but never received payment. The law firm never acquired VELCO, Big Man or Bar–Sel as a client, and neither plaintiff nor the law firm billed the entities for any legal services performed after December 5, 1979.

After the formation of the mining enterprise plaintiff continued to provide services. Plaintiff negotiated with the suppliers and creditors of VELCO, Big Man and Bar–Sel regarding outstanding liabilities of the mining enterprise; [7] with the lessors of the land regarding royalty payments and other matters; with the Flat Top Insurance Company and the Farmers and Miners bank as to proceeds from the loss of a mining auger (a drill used to maximize coal production); with Americoal, a potential buyer of the enterprise and with a "middleman" to obtain additional. investors for a finder's fee. Plaintiff attempted to bring in new investors, drafted VELCO contracts and agreements, and aided in litigation involving VELCO. Plaintiff, however, was never an employee of VELCO, Big Man or Bar–Sel, and never received any compensation for any of his activities.

Plaintiff attended partnership, directors and shareholders meetings of the three entities in Pennington Gap, Virginia, and Washington, D.C., at which the financial affairs of the enterprise were discussed. These meetings took place at least once a month during the first half of 1980 and approximately once every 6 to 8 weeks during the second half of 1980 and early 1981. Plaintiff also met with Gary Frink in Philadelphia on at least two occasions, and frequently engaged in correspondence and spoke by telephone with Barbara Poe, Charlie Poe and Gary Frink regarding the coal mining venture during the tax quarters at issue.

Plaintiff made personal loans to Big Man in March 1980 for $20,000.00, in April 1980 for $10,826.00 and $4,283.00, and in May 1981 for $3,000.00. No portion of these loans was ever repaid to plaintiff. Additionally, plaintiff settled his $200,000.00

---

**6.** The amount of the bill is evidenced by a photocopy of the bill for services (Jt.Exh. 104) on which the last digit of the bill is cutoff.

**7.** These included, C & P Telephone Company, CIT Corporation, Carter Machinery, Central Supply, Commercial Testing & Engineering Company, Cumberland Forest Products, Eagle Crusher, Jonesville Oil Company, Kentucky Powder Company, Massachusetts Mutual Life, Mid–South Mack, Old Dominion Power, Old Republic Insurance Company, Powell Valley Engineering Company, Power Equipment Company, Woodway Stone Company and Xerox.

personal guarantee on the defaulted $800,-000.00, loan for approximately $90,000.00.

On April 22, 1985, the Internal Revenue Service (IRS) assessed a 100 percent penalty against plaintiff pursuant to section 6672 in the amount of $76,911.20 for the unpaid Federal employment taxes of VELCO for the four tax quarters ending September 30, 1980, December 31, 1980, March 31, 1981, and June 30, 1981. The amount assessed for these quarters was $21,911.02, $23,276.85, $27,243.91 and $4,479.42, respectively.[8] Plaintiff paid $100.00 toward the assessed penalties as payment to cover the taxes due for one VELCO employee for the quarters at issue, and on May 6, 1985, submitted a claim, Form 843, to the IRS Center in Philadelphia seeking a refund of $100.00 and an abatement of the remaining unpaid penalties assessed under section 6672. By letter dated May 21, 1985, the IRS denied plaintiff's claim.

On June 26, 1985, plaintiff filed this action in the Claims Court for a refund of the $100.00 he paid and abatement of the remaining penalties. The defendant subsequently filed a collection action in the United States District Court for the Western District of West Virginia against both plaintiff and Gary Frink. *United States v. J. Allen Dougherty and Gary Frink*, 85–0162–H (W.D.W.VA filed November 25, 1985). By order of January 14, 1986, the case in the Claims Court was suspended in order for the district court action to proceed. A default judgment was obtained against Gary Frink in the district court action, and the defendant thereafter dismissed the case in that court against plaintiff in order for the present action to proceed. On May 21, 1986, the parties jointly moved the Claims Court to reopen proceedings. Defendant filed its First Amended and Restated Answer and a counterclaim against plaintiff on June 4, 1986, for $76,-811.20, the amount of the unpaid tax penalties.

This court held a pretrial conference on November 2, 1988. A preliminary hearing was held on January 17, 1989, at which time the court ruled on the admissibility of evidence, the admission of which was op-

posed by either plaintiff or defendant. Trial was held from April 10, 1989 through April 14, 1989. At the court's request both parties submitted post-trial briefs and proposed findings of fact after the trial.

### Discussion

I.R.C. §§ 3101(a) and 3402(a) (1954), requires employers to withhold income tax and FICA tax from employees' wages. I.R.C. § 7501(a) necessitates employers to keep these monies in trust for the United States. The employee is automatically credited for the amount of income taxes required to be withheld regardless of whether these funds are actually transferred to the government. I.R.C. §§ 1462, 3102(a).

The code imposes personal liability upon persons responsible for overseeing the collection of taxes in instances where the taxes are not paid to the government. Section 6672 states the duty requirement for liability in this action as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

I.R.C. § 6672(a).

The term "person" as used in section 6672 is defined by I.R.C. § 6671 to include corporate employer's officers and employees. It states in pertinent part:

> (b) Person defined
>
> The term "person", as used in this subchapter, includes an officer or employee of a corporation * * * who as such officer, employee * * * is under a duty to perform the act in respect of which the violation occurs.

I.R.C. § 6671(b).

■ For such a person to be subject to a 100 percent penalty he/she must (1) be

---

8. The assessment for the third quarter of 1980 reflects the $9,377.76 paid by VELCO.

under a duty "to perform the act in respect of which the violation occurs" (section 6671(b)) namely "to collect, truthfully account for, and pay over" the taxes (section 6672) (a person under this duty is called a "responsible person")[9] and (2) such a "responsible person" must have acted "willfully" in not complying with this duty. Both requirements, responsibility and willfulness, must be present for the 100 percent penalty to be imposed. *McCarty v. United States*, 194 Ct.Cl. 42, 53–54, 437 F.2d 961, 967 (1971).

■ Whether a person is responsible and has willfully failed to carry out his/her responsibility of causing the corporation to collect or truthfully account for or pay over the taxes depends upon the factual circumstances involved in each case. *See Bauer v. United States*, 211 Ct.Cl. 276, 285–86, 543 F.2d 142, 148 (1976). "Liability is not limited to those who perform the merely mechanical function of preparing the tax forms, collecting the taxes from the wages of the employees, and filing the returns." *Feist v. United States*, 221 Ct.Cl. 531, 539, 607 F.2d 954, 960 (1979) (citations omitted); *see also United States v. Graham*, 309 F.2d 210 (9th Cir.1962). "In many instances, the employees with responsibility for performing the clerical duties of collecting and paying over the taxes and preparing the returns do not have the authority to authorize the payment or to order the nonpayment of the tax." *Feist*, 221 Ct.Cl. at 539, 607 F.2d at 960.

The court must determine the person or persons with the ultimate authority and power "to compel or prohibit the allocation of corporate funds." *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984). In determining whether a person is liable for the 100 percent penalty under section 6672, the court must look beyond organizational form and find those persons "actually responsible for an employer's failure to withhold and pay over the tax." *Id.* at

1576. The United States Court of Appeals for the Federal Circuit in *Godfrey* enumerated numerous factors which are indicative of responsibility:

> Where a person has authority to sign the checks of the corporation, *see White v. United States*, 372 F.2d at 515, *McCarty v. United States*, 437 F.2d at 968, *but cf. Barrett v. United States*, 580 F.2d at 953–54, [453–54] *Marlowe v. United States*, 2 Cl.Ct. 711, 716 (1983), or to prevent their issuance by denying a necessary signature, *see Burack v. United States*, 461 F.2d [1282] at 1291, *Bolding v. United States*, 565 F.2d [663] at 671, or where that person controls the disbursement of the payroll, *see White v. United States*, 372 F.2d at 515, or controls the voting stock of the corporation, *see White v. United States*, 372 F.2d at 514, *McCarty v. United States*, 437 F.2d at 967–68, *Burack v. United States*, 461 F.2d at 1286, *Feist v. United States*, 607 F.2d at 960, *cf. Marlowe v. United States*, 2 Cl.Ct. at 716, he will generally be held "responsible".

*Id.* The court, however, must consider the substantive acts performed, merely signing checks and preparing tax returns is not dispositive of liability under section 6672. *Id.*

■ Any corporate officer or employee with the power and authority to avoid the default or to direct the payment of the taxes is a responsible person within the meaning of section 6672. *Feist*, 221 Ct.Cl. at 539, 607 F.2d at 960. Liability under this section is not limited to a single officer with the most control or authority over corporate affairs. *Bolding v. United States*, 215 Ct.Cl. 148, 161, 565 F.2d 663, 671 (1977). All responsible officers and employees of a corporation may be found liable. *Godfrey*, 748 F.2d at 1575. The government, however, may not recover more than the amount of the tax penalty.[10]

---

9. The United States Supreme Court has noted that the term "responsible person" is a creation of the courts without a statutory definition or legislative history and is used as a shorthand phrase for convenience. *Slodov. v. United States*, 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978).

10. Defendant requests, should the United States prevail in this action, that the parties be allowed 30 days to file a Stipulation for Judgment reflecting their agreement as to the amount of the

*Gens v. United States*, 222 Ct.Cl. 407, 415, 615 F.2d 1335, 1339 (1980).

The parties dispute the nature and extent of plaintiff's authority and activities on behalf of VELCO, Big Man and Bar–Sel. Plaintiff contends that he had no authority to control the funds to pay VELCO's taxes and was not aware of the delinquency. Defendant avers that plaintiff was both aware of the delinquency and in a position to authorize the payment of the funds. Defendant suggests that plaintiff was strongly motivated to use the delinquent tax fund monies to keep the enterprise running in hopes that it would someday be financially solvent, due to his concern that if Big Man defaulted on its $800,000.00 loan with the Farmers and Miners Bank, he might be called upon to satisfy his $200,000.00 personal loan guarantee and additionally he would not recover the money he personally loaned to Big Man.

The testimony of plaintiff and plaintiff's witness, Les Denson, conflicts greatly with that of defendant's witnesses, Barbara Poe, Charlie Poe and Gary Frink. The latter witnesses present plaintiff as the person who had ultimate authority over disbursing all funds, including the payment of taxes, while plaintiff and Les Denson testified that plaintiff's role in the venture was that of a passive investor who provided some services, but was not involved with the financial affairs of the enterprise.

Both Les Denson and Charlie Poe had minor involvement in the business operations of the enterprise, and therefore added little insight into the issues at hand. Additionally, much of Charlie Poe's relevant testimony was based on statements made to him by his wife.

Plaintiff contends that both Barbara Poe and Charlie Poe were motivated to conceal the failure to pay the taxes because their only income came from the enterprise, and if the taxes were paid, they would not have received their sole source of income. Plaintiff argues that Barbara Poe concealed the delinquency by writing the amount of taxes

judgment to be entered on defendant's counterclaim, as reduced by monies collected from

due in the financial record books, but not issuing the checks and therefore plaintiff could not have been aware of any tax problems by looking at these records. However, Barbara Poe explained that the payment was entered in the books when she wrote the checks and these checks were then forwarded to plaintiff in order for him to determine whether or not to send them to the IRS. *See infra* at pp. 343–45.

Plaintiff also notes that Gary Frink's testimony is influenced by the fact that any amount assessed against plaintiff will reduce the penalty for which Gary Frink will be liable. The court has carefully considered these factors in evaluating the credibility of the testimony of the witnesses.

In order to prevail in this action plaintiff must prove by a preponderance of the evidence that he was not a "responsible person", or that he did not act "willfully" in failing to discharge his duties as a "responsible person." *Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985). Plaintiff has failed to carry this burden. On the record presented, the court finds that plaintiff was a responsible person and his failure to transfer the funds to the government was willful.

### Responsible Person

■ Plaintiff asserts that he was not in a position to exercise authority over the financial affairs of VELCO. Plaintiff proclaims that he "was only enlisted by VELCO's chief operating officers to contact certain creditors after the decision to prefer them had already been made." (Plaintiff's Memorandum of Facts and Law at 30.) Further, he suggests that he was not involved with VELCO's tax payments, except for the two Federal employment tax returns prior to the quarters at issue and two Federal employment tax returns filed after VELCO was in bankruptcy and the operation had no assets. The evidence presented, however, does not substantiate these contentions.

Gary Frink.

Plaintiff testified that when creditors had refused to provide goods or services to Charlie Poe or Gary Frink he would negotiate with these creditors and would sign checks. However, he asserts that he did not make any decision as to which creditors were paid or not paid. Plaintiff tries to present himself as a credit negotiator under the direction and supervision of Gary Frink and as a checkwriter whose authority was limited to the physical act of checkwriting. However, the record shows that throughout the quarters at issue, plaintiff was intimately involved as a principal, officer and director in the financial management of the enterprise, that plaintiff had the authority to pay or withhold payment to creditors, and that he used that authority.

Plaintiff was an authorized signatory on all of the VELCO, Big Man and Bar–Sel checking accounts both at the Farmers and Miners Bank where VELCO, Big Man and Bar–Sel maintained accounts from December of 1979 through October 1980, and at the Powell Valley National Bank where VELCO and Big Man maintained accounts from October 1980 through June of 1981. Plaintiff was one of three or four persons authorized to sign checks drawn on the various checking accounts maintained by VELCO, Big Man and Bar–Sel.[11] Plaintiff was in possession of blank checks for the VELCO and Big Man general accounts, including blank checks co-signed by Gary Frink during the four quarters at issue. Plaintiff signed or co-signed, in all, 170 checks, totalling $626,214.00, on the VELCO, Big Man and Bar–Sel general accounts, from December 1979 to March 1981, not including checks returned as unpaid, voided, or those checks that plaintiff was unable to verify his signature.[12]

Barbara Poe and Gary Frink stated that after a meeting in April 1980, plaintiff removed the checkbooks for the VELCO and Big Man general accounts maintained at the Farmers and Miners Bank and Powell Valley National Bank and took them to Philadelphia without returning them. Barbara Poe and Gary Frink retained the payroll checkbooks at the Pennington Gap office. Barbara Poe testified that she had to get checks at the bank without VELCO's name printed on them to pay general account items because plaintiff had all the general account checks. Gary Frink stated during trial that plaintiff "had the checkbooks in Philadelphia. And, when he would come down to Pennington Gap I would sign packets of checks, blank for him; and he would allocate where the money went. He decided who was to be paid; and he made these very significant choices." (Transcript (Tr.) at 672.)

Both Barbara Poe and Gary Frink testified that throughout the quarters at issue plaintiff had ultimate control over the financial affairs of VELCO, Big Man and Bar–Sel, including the determination of which creditors would or would not be paid and the amounts to be paid to such creditors. They assert that in early 1980, plaintiff, at his insistence, took control over the financial matters of the enterprise, including payments to creditors. Consequently, from the spring of 1980 through the tax quarters at issue, they had no autonomy to pay commercial creditors and suppliers without plaintiff's approval, except under certain limited circumstances where plaintiff had authorized the payment of emergency bills or bills for office maintenance or other small items. Plaintiff directly instructed the Farmers and Miners Bank to transfer funds between the various VELCO, Big Man and Bar–Sel accounts on 16 occasions between March 31, 1980, and September 23, 1980. Barbara Poe stated that in April 1980, plaintiff instructed her to

---

11. All of these checking accounts required two authorized signatures on checks of $500.00 or more. However, it appears from the record that this requirement was not satisfied for all checks in all accounts. For example, in the VELCO general account at Powell Valley National Bank, plaintiff alone had signed and issued numerous checks for amounts substantially in excess of $500.00 during the fourth quarter of 1980 and the first quarter of 1981. (Appendix D, Joint Memorandum Re: Stipulations.)

12. These checks, however, have plaintiff's signature on them. (Appendix A, Joint Memorandum Re: Stipulations.)

"slow roll" creditors for periods of 30, 60 and 90 days. (Tr. at 718.)

Barbara Poe and Gary Frink testified that after the April 1980, meeting when plaintiff removed the checkbooks for the VELCO and Big Man general accounts, plaintiff also took possession of the VEL-CO, Big Man and Bar–Sel records and ledgers from Pennington Gap where Barbara Poe had maintained them and retained these materials in Philadelphia for approximately one month before returning them to Barbara Poe. While plaintiff had possession of the records and ledgers, Barbara Poe maintained a notebook in which she recorded the financial information.

Barbara Poe contends that plaintiff's role was so important, and the authority of others so limited, that on one occasion the mining operations came to a halt because plaintiff could not be reached to authorize the purchase of a part needed for the operations.[13] Defendant claims that plaintiff intended that he would assume substantial control of the enterprise from the outset of the company's active operations, noting an October 29, 1979, memorandum from Gary Frink to plaintiff in which Gary Frink questioned the plaintiff: "[h]ow do we control the revenues from Washington and yet give them enough operating authority in Pennington Gap to pay wages on a weekly basis, insurance, fuel supplies...." (Jt. Exh. 108.)

Plaintiff's involvement in the financial affairs is also evidenced by his partic-ipation in the preparation and filing of the VELCO tax returns. Plaintiff filed Federal employment tax returns on behalf of VELCO after the three entities filed for bankruptcy. Plaintiff testified that he also supervised the preparation of the returns for the first and second quarters of 1980. However, he claims that after filing the returns in the first and second tax quarter of 1980, he did not file any returns, nor participate in the preparation of returns for the tax periods at issue. He contends that all VELCO Federal income tax returns during the relevant period were prepared by an outside accountant, Richard Bennett and the VELCO Federal employment tax returns at issue were prepared by Barbara Poe. The record provides ample evidence that plaintiff's participation in these matters was extensive.

Barbara Poe stated that, acting under plaintiff's direction, she prepared VELCO's Federal employment tax returns for the four tax quarters of 1980 and first two tax quarters of 1981, and sent them to plaintiff.[14] The following is from the direct testimony of Barbara Poe:

Q. Would you describe, for us, how payroll taxes were paid, or were intended to be paid, on behalf of VELCO?

A. On the onset I had bank deposits, and I would take a check from the payroll account and deposit it in Farmers and Miners Bank, when Mr. Dougherty gave me the authority to do this. If he would allocate just the net payroll, and I

---

**13.** According to Barbara Poe's testimony, the part needed was a special tire used for mining coal in the mountains. She estimated the cost of this part at approximately $2,000.00 to $3,000.00. (Tr. at 852.)

**14.** On March 31, 1980, Barbara Poe sent a note to plaintiff concerning the "VELCO Payroll of Week of March 28, 1980 for Week Ending March 22, 1980," which stated "This is the third week we are behind in payroll taxes." (Jt.Exh. 196.) At the end of the first tax quarter of 1980, Barbara Poe sent plaintiff a copy of the Form 941, the form used to report and pay the Federal employment taxes due, which reflected VELCO's tax delinquency. On or near April 23, 1980, Barbara Poe sent a handwritten note to plaintiff dated April 23, 1980, which reads as follows:
Allen,
By April 30, we need to send $4,036.99

1,341.29
and 1,902.33 (this check was written, but I believe you voided it) a total of
4,936.99
$5,939.32 to the IRS in Memphis, Tn. I
I don't want a visit from Mr. Gunning again.
Barbara
(Jt.Exh. 197.) Mr. Gunning was the IRS agent that Barbara Poe dealt with regarding Bar–Sel's delinquent employment taxes prior to its acquisition by Big Man. On June 6, 1980, plaintiff wrote a check in the amount of $4,036.99, co-signed by Gary Frink, and sent the check and the original of the Form 941 to Barbara Poe. For the second quarter of 1980 Barbara Poe again prepared the Federal employment tax return and sent it to plaintiff in July 1980.

wasn't able to deposit the monies, it wouldn't be deposited.

Q. Could you describe for us what you meant by bank deposits?

A. The bank, the IRS has this little slip that you can take to the bank and deposit it, and I think that's the way the first few deposits were made.

THE COURT: Excuse me, would you go over that procedure and explain to us exactly how this was done?

THE WITNESS: The IRS would send a little slip that you could deposit to the bank, and the bank would then send your payment on to the IRS.

THE COURT: The bank would send the payment to the IRS?

THE WITNESS: That's correct.

Q. Is the system you have just described, Mrs. Poe, a system that is used when an employer is making Federal Employment Tax payments on a current basis?

A. Yes, it is.

Q. And, if an employer becomes delinquent in paying Federal Employment Taxes, how does it—

A. They have to send—

Q. —pay the difference.

A. They have to send it in with the 941 form.

Q. And when you say send it in, do you mean send in a check with the 941?

A. That's right.

(Tr. at 730–31.)

In addition, Barbara Poe explained "voiding the checks" as follows:

THE COURT: Would you explain this [Jt.Exh. 199 (quoted below)] that you have written here. The statement you have just read, would you explain that, please?

THE WITNESS: Okay. These bank deposit slips are the slips we were talking about earlier, that I would take to the bank and deposit, and I had already made those out, each week as they came due, so I just put everything in with the 941 and sent them—

THE COURT: So, the money was there, and—

THE WITNESS: The check was there, the money wasn't in the account.

THE COURT: And your reference to voiding the checks, what did you mean by that?

THE WITNESS: In case he wanted to write the full amount that was due, the $21,000.

THE COURT: Thank you.

(Tr. at 740–41.)

Plaintiff did not allocate sufficient funds to the account for the taxes for either the second or third quarter of 1980. Consequently, Barbara Poe did not write or deposit checks beginning in the fourth quarter of 1980.

In October of 1980 Barbara Poe sent plaintiff the original Federal employment tax return Form 941 for the third quarter of 1980 with untendered weekly Federal employment tax checks and a note stating:

Allen, I have made bank deposit slips and checks for this amount [referring to $21,-911.02, the final deposit due by VELCO for the quarter ending September 30, 1980] in the event you want to write a check for the above amount to the IRS, please let me know and I will void these checks.

Barbara

(Jt.Exh. 199.) The note reflected Barbara Poe's intent to "void" the payments in the ledger books in which she kept track of whether a check had been written. Barbara Poe thereafter discussed this return and VELCO's tax liabilities with plaintiff.

Barbara Poe also sent plaintiff the 941 Forms for the fourth quarter of 1980, and the first and second quarter of 1981, all reflecting the unpaid Federal employment taxes for the respective quarters. She contends that plaintiff mailed the original Federal employment tax returns for these tax quarters to the IRS. Plaintiff denies involvement with preparing or filing these returns. However, the envelopes attached to the original VELCO Federal employment tax returns for the fourth quarter of 1980, and the first quarter of 1981, had Philadelphia postmarks, while the enterprise only had officers in Washington, D.C., and Pennington Gap, Virginia. When asked on

cross-examination about the postmarks, plaintiff, referring to whether he sent the tax returns, stated that "it may mean that I did it, but I don't remember." (Tr. at 417) Neither plaintiff nor any other witnesses offered an explanation for the Philadelphia postmarks. Additionally, Form 941, for the second quarter of 1981 was signed "Gary Frink by J. Allen Dougherty pursuant to Power of Attorney."[15]

Plaintiff testified that he directed the payment of VELCO's Federal employment taxes for the second quarter of 1980 in September of that year but subsequently delegated responsibility for the payment of VELCO's Federal employment taxes to Gary Frink in October 1980, after a "shouting match" with Gary Frink. Plaintiff contends that Gary Frink said "you have been taking action to pay those taxes and that is a detriment to this company because we need that money to operate with." (Tr. at 463–464.) To which plaintiff responded, "if you don't want to pay taxes, I think that is the wrong thing to do. I think they should be paid. You are running the company, you make the decision, but I urge you to pay those taxes currently at any time they are due." *Id.* Plaintiff claims that he then left all matters relating to finances to Gary Frink. Plaintiff asserts that after October 15, 1980, he:

> Did not make any further statements to Mr. Frink [about VELCO's employment taxes] to [his] knowledge. The occasion to have a discussion with him on that specific subject did not come from me and he did not raise it with me. I did because I continued to deal with creditors as requested, and therefore I was

dealing with Barbara or someone else on that, and if I were dealing with money in the general account to pay I would inquire or say to her, "Are you paying the taxes?" and if she hesitated on that, or said "no, we are working on that," or "Yes, we are working on that" or whatever her response was, I said, "I hope you will pay those taxes." But I felt that I was not in a position to demand that at that time.

(Tr. at 464–65.) Plaintiff also testified that after the argument he had a few conversations with Barbara Poe regarding Federal employment taxes.

Gary Frink contends that the argument with plaintiff arose because plaintiff was concerned about the payment of operating expenses over taxes. Gary Frink denies that plaintiff delegated authority over Federal employment tax matters to him. Moreover, Barbara Poe, who reported to plaintiff in the performance of her bookkeeping duties, stated that neither plaintiff nor Gary Frink ever told her that she should report to Gary Frink regarding employment tax matters, and that the nature of her discussions with plaintiff regarding Federal employment tax matters did not change between September 1980, and the spring of 1981. Furthermore after October 15, 1980, plaintiff was the sole signatory on a number of checks drawn on the VELCO general account for the fourth quarter 1980 and the first quarter 1981.[16]

Considering the extent of plaintiff's involvement with VELCO's federal and state taxes,[17] plaintiff's knowledge of Bar–Sel's outstanding 1979 taxes and his expertise in

---

**15.** There was no evidence produced during the trial that Gary Frink had given plaintiff a power of attorney.

**16.** As mentioned in footnote 11, *supra* at p. 342, it appears from the record that despite a requirement of two authorized signatures for checks over $500.00, plaintiff drew numerous checks above that amount with his signature alone. (Appendixes B, D, and E; Joint Memorandum Re: Stipulations.)

**17.** At the inception of the enterprise in 1979 plaintiff attempted to negotiate a payoff schedule with the IRS for Bar–Sel's then outstanding

Federal employment tax liabilities, and ultimately agreed to the payment of these liabilities with a portion of the proceeds from the $800,-000.00 loan. In the first tax period at issue, plaintiff directed Barbara Poe to pay VELCO's taxes for the second quarter of 1980 which were delinquent at that time. In June 1980 plaintiff also secured the payment of VELCO's delinquent Federal employment tax liabilities for the first quarter of 1980. In March 1981, during the third quarter at issue plaintiff negotiated the payment of delinquent Virginia state employment taxes for VELCO in 1980 and co-signed checks in satisfaction of these liabilities. (Tr. 168–69; Jt.Exh. 66; Check Nos. 1054–1057.)

tax law, it is difficult to believe that for the tax quarters at issue plaintiff did not play a significant role in filing or preparing the VELCO taxes. The fact that the VELCO Federal employment tax returns for the fourth quarter of 1980 and first quarter of 1981 had Philadelphia postmarks, as well as the signature of plaintiff for the second quarter of 1981, also mitigates against plaintiff. Accordingly, the court finds that the plaintiff was actively involved in both preparing and filing VELCO Federal employment tax returns during the quarters at issue. The court finds that the plaintiff had the power, authority and control to direct payment toward the delinquent Federal employment taxes during the tax quarters at issue and therefore he was a "responsible person" under section 6672.[18] Plaintiff's contention that he was not involved with VELCO's taxes is contrary to both logic and the evidence.

Furthermore, although one can delegate responsibility for Federal employment tax matters, the evidence clearly shows that plaintiff did not do so.[19] A delegation is only effective if it is comprehensive as to power and authority over corporate affairs and the ultimate control over corporate management is placed completely in another officer. *Moore v. United States*, 59 A.F.T.R.2d (P–H) 87–908, 87–911, 1987 WL 11280 (S.D.W.Va.1987). Plaintiff continued his extensive involvement in the financial and business affairs of the enterprise even after October 15, 1980, attending meetings with other VELCO principals at which financial matters were discussed, receiving payroll and other financial information, negotiating and corresponding with VELCO, Big Man, and Bar–Sel creditors and authorizing payments and signing checks to creditors other than the United States. Thus, he did not effectively delegate his duties. *See Burack*, 198 Ct.Cl. at 867–68, 461 F.2d at 1290–91. Moreover, a responsible person "cannot absolve himself mere-

ly by disregarding his duty and leaving it to someone else to discharge." *Hornsby v. Internal Revenue Serv.*, 588 F.2d 952, 953 (5th Cir.1979); *see also George v. United States*, 819 F.2d 1008, 1012 (11th Cir.1987); *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir.); *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Johnson v. United States*, 565 F.Supp. 253, 256–57 (S.D.Tex.1983).

Even if this court believed that plaintiff had delegated his duties after the "shouting match" with Gary Frink on October 15, 1980, which the court does not, this court would find that plaintiff would still be a responsible person for the third quarter of 1980 (which ended on September 30, 1980, approximately two weeks before the purported delegation), and would be a responsible person for the entire fourth quarter of 1980. In *Slodov v. United States*, 436 U.S. 238, 247, 98 S.Ct. 1778, 1785, 56 L.Ed.2d 251 (1978), the United States Supreme Court concluded that an officer or employee need not be responsible for the payment of withholding taxes at the end of the quarter in order to be a responsible person for that quarter. Additionally, plaintiff would be a responsible person for the first and second quarters of 1981 due to Gary Frink's abandonment of the enterprise in March of 1981, and plaintiff becoming the sole authority figure for VELCO. *See Brown*, 591 F.2d at 1140; *Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir.1987).

Plaintiff further argues that he had no control over the payments made by VELCO because other authorized signatories on the VELCO, Big Man, and Bar–Sel accounts could have signed checks in his absence; thus, his refusal to sign checks would have been ineffective. This, however, cannot absolve plaintiff of liability. While other officers or employees may have exercised the same or greater authority, this fact does

---

**18.** The facts here are clearly distinguishable from *Godfrey* where the Court of Appeals for the Federal Circuit found that there was no evidence that plaintiff had or exercised control over the payment of taxes. *Godfrey*, 748 F.2d at 1576.

**19.** It should be noted that under VELCO's By-Laws (paragraph 15), the duties of the officers may be delegated; however there has been no showing by plaintiff that he has complied with this provision of the By-Laws.

not affect a finding of liability against plaintiff. *See Gephart v. United States*, 818 F.2d 469, 476 (6th Cir.1987). Under section 6672 any person with sufficient authority is a responsible person regardless of whether others also have such authority. *Burack*, 198 Ct.Cl. at 869, 461 F.2d at 1291.

It is evident from the facts that J. Allen Dougherty had the "power to compel or prohibit the allocation of corporate funds." *Godfrey*, 748 F.2d at 1576. He is not exempted from responsibility because others may have had the same or greater authority and the court finds that he never delegated his responsibility. Thus, plaintiff is a responsible person under section 6672 for the four tax quarters at issue.

### Willfulness

Plaintiff requests that if the court should determine that he is a responsible person that the court should nevertheless find that his actions were not "willful" and therefore, he should not be held liable under section 6672. Plaintiff avers that he was unaware of the unpaid taxes for the quarters at issue. The record, however, does not support this assertion.

In order for a "responsible person" to be liable under section 6672 he must have acted "willfully" in failing to collect, truthfully account for or pay over the delinquent and unpaid Federal employment taxes. Willfulness for purposes of this statute has been defined as "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government." *White v. United States*, 178 Ct.Cl. 765, 778, 779, 372 F.2d 513, 521 (1967). Mere knowledge of a past delinquency does not impose strict liability on a responsible officer for delinquencies during his tenure. *Godfrey*, 748 F.2d at 1578. In addition, negligence in determining a tax delinquency is insufficient to constitute willfulness. *Bauer*, 211 Ct.Cl. at 289, 543 F.2d at 150; *see also Bolding*, 215 Ct.Cl. at 163, 565 F.2d at 672.

### The "Reckless Disregard" Standard of Willfulness

"Willful conduct may also include a reckless disregard of an 'obvious and known risk ... that taxes might not be remitted'." *Godfrey*, 748 F.2d at 1577 (citations omitted). "[I]f a responsible officer knows that the corporation has recently committed such a delinquency and knows that since then its affairs have continued to deteriorate, he runs the risk of being held liable if he fails to take any steps either to ascertain, before signing checks, what the state of the tax withholding account is, or to institute effective financial controls to guard against non-payment." *Wright v. United States*, 809 F.2d 425, 428 (7th Cir. 1987) (citations omitted); *see also United States v. Leuschner*, 336 F.2d 246, 248 (9th Cir.1964). However, "merely because a corporate officer has check-signing responsibilities and his corporation is in financial trouble, it does not follow that he can be held liable for any and all failures to pay withholding taxes." *Wright*, 809 F.2d at 428. Even considering plaintiff's version of events, the record establishes that plaintiff acted willfully in that, during the tax quarters at issue, he recklessly disregarded his duty to collect and pay over VELCO's Federal employment taxes and ignored the risks that VELCO's Federal employment taxes would not be paid. *Wright*, 809 F.2d 425.

Plaintiff, who is an experienced tax attorney familiar with section 6672 cases, was aware that VELCO's Federal employment taxes for the first and second quarters of 1980 had not been fully paid until plaintiff himself undertook to secure payments of the delinquencies for those quarters. Plaintiff maintains that although he was aware of the ongoing financial difficulties of VELCO, Big Man and Bar–Sel and continued to have discussions with Gary Frink and Barbara Poe regarding other VELCO, Big Man, and Bar–Sel business and financial matters,[20] he did not attempt to determine whether VELCO's taxes were being

---

**20.** When asked on cross-examination: "Now, you were aware that VELCO and Big Man continued to experience cash crisis between Octo-

ber of 1980 and June of 1981; were you not?" Plaintiff responded: "Yes." (Tr. at 427.)

paid. However, Barbara Poe testified that the prepared monthly financial statements for VELCO, Big Man, and Bar–Sel which showed the tax liabilities at issue were sent to plaintiff on a monthly basis from April 1980 through March 1981. Plaintiff testified that he "may have received these" and that if he did receive them, that "he did not pay very much attention to them, if any." (Tr. at 340.) Additionally, the accountant for VELCO, Big Man and Bar–Sel, Richard Bennett, prepared six financial statements during the period of March 31, 1980 through March 31, 1981, and these statements also showed the Federal employment tax liabilities at issue. Plaintiff stated that he did not think he "reviewed them with any great care." (Tr. at 331.)

Even if the court accepted as true plaintiff's allegation that he was unaware of the delinquency, which it does not, plaintiff's actions constituted recklessness sufficient to satisfy the willfulness test of section 6672.

In *Wright v. United States*, 809 F.2d 425, 427–28 (7th Cir.1987), the Seventh Circuit, found that the plaintiff in that case had acted willfully under section 6672 by acting with recklessness. The *Wright* court distinguished its case from *Godfrey:*

> We emphasize that merely because a corporate officer has check-signing responsibilities and his corporation is in financial trouble, it does not follow that he can be held liable for any and all failures to pay withholding taxes. Nor have we any quarrel with *Godfrey v. United States*, 748 F.2d 1568 (Fed.Cir.1984), which held that mere knowledge of a past delinquency does not impose strict liability on a responsible officer for delinquencies during his tenure. But if a responsible officer knows that the corporation has recently committed such a delinquency and knows that since then its affairs have continued to deteriorate, he runs the risk of being held liable if he fails to take any step either to ascertain, before signing checks, what the state of the tax withholding account is, or to institute effective financial controls to guard against non-payment. *See Hornsby v. IRS, supra; United States v. Leuschner*, 336

F.2d 246, 248 (9th Cir.1964). Wright did neither of these things.

*Id.* at 428.

As in *Wright*, the plaintiff here, under his account of the facts, was aware of the past tax problems, was aware of the deteriorating financial situation of the enterprise, and yet he still failed to take steps himself to ascertain whether the federal taxes were being paid prior to signing checks to other creditors. Plaintiff's actions constituted recklessness sufficient to fulfill the willfulness requirement. *Wright*, 809 F.2d at 427–28; *Ruth v. United States*, 823 F.2d 1091, 1095 (7th Cir.1987) (corporate principal willfully violated section 6672 where principal "knew that [corporation] was constantly in tax difficulty, that its checking accounts were overdrawn and that its payroll checks were dishonored [and] discussed potential federal tax liabilities with other corporate officers [but] continued to sign checks to creditors other than the IRS"); *Internal Revenue Service v. Blais*, 612 F.Supp. 700, 711 (D.Mass.1985) (taxpayer, who continued to pay other bills knowing that the business was in financial trouble, exhibited "reckless disregard" where taxpayer "if not knowing that the taxes remained unpaid, at the least knew that he could easily find out by asking"); *Dougherty v. United States*, 327 F.Supp. 202, 205 (D.S.D.1971), *aff'd*, 471 F.2d 656 (8th Cir. 1972) (plaintiff on notice of financial difficulties of corporation which had prior lack of efficient management, who relied on others for collection and payment of taxes and "willfully" violated Section 6672); *Schwinger v. United States*, 652 F.Supp. 464, 469–70 (E.D.N.Y.1987) ("even though plaintiff did not know that [IRS] payment schedule was not being met, his failure to investigate or to correct mismanagement after having notice that withholding tax delinquencies existed constitutes willful conduct for purposes of Section 6672"); *Gold v. United States*, 506 F.Supp. 473, 479, 480 (E.D.N.Y.1981), *aff'd*, 671 F.2d 492 (2d Cir.1981) (conduct "willful" where responsible person knew that the controller on whom he relied had previously failed to see that payroll taxes were paid and had

preferred other creditors; yet he "did nothing to see that this did not happen again"); *Grover v. United States*, 691 F.Supp. 1572, 1577 (D.Mass.1988) (conduct "willful" where responsible persons were aware of delegate's "financial mismanagement" and "unreliability"). *Bolding*, 215 Ct.Cl. at 166, 565 F.2d at 674.

Accordingly, plaintiff acted "with reckless disregard of a known or obvious risk that trust fund taxes may not be remitted to the Government ... such as by failing to investigate or to correct mismanagement after being notified that withholding taxes had not been duly remitted." *Godfrey*, 748 F.2d at 1578 (citations omitted).

### Actual knowledge, personal fault and intentional acts as requirements of willfulness

Under *Godfrey* a showing of actual knowledge or actual notice by the plaintiff of the delinquency for the four tax quarters is a necessary factor in the willfulness determination. In *Godfrey*, the Court of Appeals for the Federal Circuit found that plaintiff did not act willfully, because "case law requires ... at least actual notice of the current delinquency to establish an affirmative duty to act." *Id.* at 1578. The Federal Circuit noted that although plaintiff in *Godfrey* was aware of delinquencies of the corporation in the past, it could not be imputed that he was aware of the delinquencies in subsequent quarters. Additionally, the court found that Godfrey's "sole act ... in relation to taxes was an instruction looking to payment and not to evasion or defeat." *Id.* at 1577. Further "personal fault being a necessary element of willfulness, relevant evidence bearing on the element of personal fault may not be ignored." *Id.* (citations omitted).

In the case at bar, plaintiff's testimony that he paid little attention to the financial details of the enterprise is not credible and in direct conflict with the testimony of Gary Frink and Barbara Poe. Thus, the court finds that J. Allen Dougherty had actual knowledge or actual notice of the tax delinquencies during the four quarters at issue, had deliberately elected not to pay the delinquencies and was personally at fault for the delinquencies.[21]

Plaintiff was advised of deposits and disbursements of VELCO which reflected the tax delinquencies. Barbara Poe and plaintiff communicated by telephone on a weekly basis between early 1980 and April 1981, regarding all deposits made on behalf of the enterprise. Barbara Poe advised him as to the funds transferred to the VELCO payroll accounts, at his direction, which were insufficient to cover VELCO's payroll expenses. Plaintiff received either originals or copies of all bills of the entities. Barbara Poe also advised plaintiff, on a weekly basis that Federal employment taxes were not being paid, during 1981 and forwarded to plaintiff tax penalty notices received at Pennington Gap. Plaintiff also talked by phone to Gary Frink several times a week between January 1980 and March 1981, regarding the business matters of the enterprise, including the financial affairs.

After bank statements for the VELCO, Big Man, Bar–Sel checking accounts were received at the Pennington Gap office, Barbara Poe prepared bank reconciliation worksheets and bank statements and sent these and the cancelled bank checks to plaintiff in Philadelphia. In November 1980, Barbara Poe sent a worksheet for the VELCO payroll account as of October 31, 1980, on which Barbara Poe wrote the following note in relation to unpaid Federal employment taxes for the third quarter of 1980: "Allen, I am still holding these checks until we are able to pay them." (Tr. at 753–54.) Barbara Poe thus notified plaintiff to transfer the necessary funds to the account in order to pay the taxes.

Between April 1980, and March 1981, Barbara Poe prepared monthly and quarterly informal financial statements reflecting VELCO's unpaid Federal employment tax liabilities. Barbara Poe testified that

---

**21.** In *Godfrey*, there was knowledge only of a past tax delinquency but no actual knowledge concerning the delinquencies that were at issue. Therefore, the court did not find personal fault. 748 F.2d at 1578.

she sent these forms to plaintiff and discussed them with him. In addition, Barbara Poe stated that she forwarded to plaintiff, at his request, weekly copies of pages from VELCO's payroll ledgers and payroll summary sheets reflecting VELCO's payroll expenses, including Federal employment taxes for each payroll period from April 4, 1980 through April 24, 1981. The completed Federal employment tax returns, Form 941, were sent by Barbara Poe to plaintiff for each tax quarter at issue and they reflected VELCO's unpaid Federal employment tax liabilities. Moreover, in February 1981, plaintiff himself forwarded information regarding VELCO's payroll expenses for November and December 1980, to VELCO's workmen's insurance compensation carrier, the Old Republic Insurance Company.

VELCO employed an outside accountant, Richard Bennett, until the spring of 1981. Richard Bennett prepared consolidated financial statements for the three entities which showed VELCO's then current tax liability as of March 31, 1980, June 30, 1980, August 31, 1980, September 30, 1980, December 31, 1980 and March 31, 1981, the latter reflecting a liability of $101,945.00 for Federal employment taxes. Plaintiff also received copies of the financial statements prepared by Richard Bennett.

It is unrealistic that plaintiff, a tax attorney, who spoke often with Gary Frink and Barbara Poe, constantly received information regarding the financial affairs of the enterprise, continually dealt with the companies finances in negotiating with creditors, discussed matters with potential investors and a wide range of activities could be unaware of VELCO's payroll expense and Federal employment tax delinquencies during the tax quarters at issue. *See Bolding*, 215 Ct.Cl. at 166, 565 F.2d at 674.

Notwithstanding his knowledge of VELCO's Federal employment tax delinquencies, plaintiff did not take any action after the first quarter at issue to ensure payment of the tax liabilities. Plaintiff continued to sign and co-sign checks and to authorize payments to creditors other than the United States in violation of section 6672, with VELCO funds, which were sufficient to pay its tax obligations for the four quarters at issue.[22]

Plaintiff had actual knowledge of a current liability which created an affirmative duty to act. *Godfrey*, 748 F.2d at 1578. Thus, plaintiff's failure to pay over the taxes here involved, given his authority, control and opportunity to perform these duties, and his intentional acts in paying other creditors than the United States, constitutes the element of personal fault that is "the epitome of wilfulness." *Id.* at 1579.

Plaintiff suggests that he should not be found liable because his activities on behalf of the enterprise constituted "reasonable action" to protect his investment in the venture and to limit his exposure under the personal loan guarantee. However, a responsible person is not excused from liability because there may be a "reasonable cause" for the delinquency. *See Burack*, 198 Ct.Cl. at 870–71, 461 F.2d at 1291–92; *McCarty v. United States*, 194 Ct.Cl. 42, 57, 437 F.2d 961, 969 (1971).

Defendant established a *prima facie* case as to plaintiff's liability on the counterclaim via introduction of a certified copy of the "Certification of Assessments" (Jt. Exh. 1) against plaintiff. *United States v. Pomponio*, 635 F.2d 293, 296 (4th Cir.1980) (citations omitted). Plaintiff has not proved by a preponderance of the evidence that the assessment made against him was erroneous, i.e., that he was either not a "responsible person", or that he did not act "willfully" in failing to discharge his duties as a "responsible person." *See, e.g., Collins v. United States*, 848 F.2d 740, 742 (6th Cir.1988); *Godfrey*, 748 F.2d at 1577.

### Conclusion

The court concludes that throughout the four quarters at issue, plaintiff was a "re-

---

**22.** Additionally, plaintiff's use of his personal funds to pay coal lease royalty payments in May and June of 1981, when VELCO had unpaid Federal employment taxes constitutes a further basis for a finding of willfulness with respect to the second quarter of 1981. *See Sorenson v. United States*, 521 F.2d 325, 327 (9th Cir.1975).

sponsible person" within the definition of section 6671(b) and that he willfully failed to carry out the duties imposed by section 6672. Accordingly, plaintiff's request for a refund of the $100.00 paid in partial satisfaction of the penalty assessed by the government is denied. Defendant's counterclaim for $76,811.20 is granted.

The parties shall advise the court, within 30 days, as to the amount of the judgment to be entered on defendant's counterclaim, against plaintiff, J. Allen Dougherty, as reduced by monies collected from Gary Frink. The Clerk is directed to dismiss plaintiff's complaint at that time without further order of this court. No costs.